**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

_____

ERIC W. SORENSON,

        Plaintiff,


v.               **FINDINGS OF FACT, CONCLUSIONS**
                  **OF LAW & ORDER**
                  Civil File No. 07-4720 (MJD/AJB)


JANEA M. SORENSON,

        Defendant.

_____

Susan Anderson McKay, McKay & Perusse, LLC, for Plaintiff Eric W. Sorenson.

Janea M. Sorenson, pro se.

_____

## I.    INTRODUCTION

This matter came on for trial before the Court on March 25, 2008 pursuant to Article 15 of the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 ("Convention") and the International Child Abduction Remedies Act, 42 U.S.C. § 11601, et seq., ("ICARA") for a determination of whether the minor child of the parties is a

1

habitual resident of the State of Minnesota, United States, and whether Defendant wrongfully retained the minor child within Australia.

At trial, Plaintiff appeared in person with his counsel, Susan Anderson McKay of McKay & Perusse, LLC. Plaintiff presented three witnesses: John Vento, Amy Wickstrom Daly, and Eric W. Sorenson. Defendant appeared pro se, by telephone from Sydney, Australia. Defendant called in to the Court proceeding and the Court faxed exhibits to her at an Australian telephone number, which she received. Defendant presented no witnesses at the trial. The parties have both also submitted affidavits and exhibits, which the Court has considered.[1]

Based upon the presentations of counsel and Janea Sorenson, the submissions filed in this matter, and the evidence adduced during the trial, the Court makes the following findings of fact and conclusions of law. To the extent that findings of fact may be considered conclusions of law, they will be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they will be deemed findings of fact.

---

[1]Defendant submitted multiple affidavits to the Court. [Docket No. 22] In reaching its decision, the Court has not relied on the unsigned affidavit submitted by Defendant, filed in the Family Court of Australia on March 6, 2008.

2

## II.    FINDINGS OF FACT

The Court makes the following findings of fact by a preponderance of the evidence:

### A.    Factual Background

### 1.    General Facts Relating to Relocation to Australia

Plaintiff Eric Sorenson ("Father") and Defendant Janea M. Sorenson ("Mother") are citizens of the United States.

Father and Mother were married in Chicago, Illinois, on October 25, 2002.

Their minor daughter, E.S.S., is also a U.S. citizen, and was born in Woodbury, Minnesota, on **[REDACTED]** 2002.

In November 2003, Father accepted a position with Secure Computing Corporation as a Sales Engineer in Secure Computing's Chatswood, Australia, office.

Secure Computing's November 7, 2003, offer letter did not contain a termination date for Father's employment or state any particular duration for his employment in Australia.

Father's employer helped him to obtain a 457 Long-Term Business Stay Visa with a three-year duration.

Mother and E.S.S. obtained three-year Australian visas that were dependent upon Father's visa status.

All of the Sorensons' visas were set to expire on June 2, 2007.

In preparation for their move to Australia, Mother and Father sold their house in Minnesota.  They also sold their two cars.

The Sorensons shipped almost all of their personal belongs to Australia. They left some belongings with Father's parents and some belongings with Mother's grandparents.

Father, Mother, and E.S.S. moved to Australia in February 2004.

While in Australia, neither Father nor Mother purchased a home.

Within a few months of moving to Australia, the marital relationship became strained.

Mother and Father separated in October 2004, but continued to reside in the same home.

In March 2005, Mother and Father separated their residences.

Despite the separation, Father and Mother determined that they would both remain in Australia along with E.S.S.

While in Australia, Father did not purchase a car.

4

Neither Father nor Mother obtained Australian drivers licenses.

Father remained on the voter rolls in Minnesota and received and returned absentee ballots for Minnesota elections while he was in Australia.  Father used the Sorensons' former Minnesota residence as his address for purposes of voting, although the Sorensons had sold that house.

Father renewed his Minnesota drivers license in May 2004, during a visit to Minnesota, after he first moved to Australia.  Father used his parents' address in Eden Prairie, Minnesota, as his residence listed on his Minnesota drivers license.

Father and Mother shared a joint bank account at U.S. Bank that they continued to use when they moved to Australia.

After Father and Mother separated, Father opened a bank account with a Minnesota credit union and, later, with Wells Fargo.

Father also opened and used an Australian bank account while living in Australia.

Upon moving to Australia, Mother and Father surrendered their Minnesota residency under federal and state tax laws and claimed Australia as their residence on their tax forms.

During the summer of 2006, due to problems in her romantic relationship,

Mother contemplated relocating to California, but not to Minnesota.

In May 2007, Mother again contemplated relocating to the United States with E.S.S.  At that time, Mother and Father exchanged e-mails regarding possible flights from Australia to the United States.

Mother did not plan to return to Minnesota, but rather, contemplated moving to California.  The Sorensons had no connection to California.

On May 30, 2007, Mother formally informed Father, through her solicitor, that E.S.S. would be staying in Australia and that Mother would be obtaining new Australian visas for Mother and E.S.S.

Beginning on June 2, 2007, after the Sorensons' three original visas expired, Mother retained E.S.S. in Australia against Father's wishes.

Immediately before Mother retained E.S.S. in Australia, in May 2007, all of E.S.S.'s friends were in Australia.

As of May 2007, E.S.S. had an Australian accent.

E.S.S. has been living in Australia since February 2004, when she was approximately 14 months old.

Until Father's visa expired in June 2007, E.S.S. was located in Australia with the permission of both Father and Mother.

6

Upon the expiration of his visa, Father returned to the Minnesota.

Mother remains in Australia with E.S.S.

Father has returned to Australia to visit E.S.S.

The marital relationship of the parties has not been terminated and there

are no custody orders in place establishing either parent as the legal or physical

custodial parent.

### 2.    The Sorensons' Intention upon Moving to Australia

**At the time of the Sorensons' relocation to Australia, they did not have a definite intention to return to the United States, let alone to Minnesota.  Their intention was to live in Australia for an indefinite period of time, lasting at least three years.  The Sorensons intended to make Australia their new home.** The Court bases this finding on various evidence in the record.

This finding is supported by the testimony of John Vento that Father stated

he was going to move to Australia for three years and then, after that, he would

have other opportunities within Secure Computing.  Vento further testified that

these other opportunities would not necessarily be in Minnesota, but could be in

another of Secure Computing's global offices, including offices in Australia,

overseas, or in other U.S. locations.  Father did not express an intent to move

temporarily to Australia and then return to Minnesota.  The Court finds Vento's testimony credible and gives it substantial weight.

The Court's finding is also supported by the February 5, 2008 affidavit of Janea Sorenson, averring that, at the time of the Sorensons' move to Australia, they intended to remain in Australia indefinitely, they had no plans to return to Minnesota or to the United States in general, and they had no agreement regarding how long they would remain in Australia.  The Court finds these statements credible, particularly in light of the objective evidence of the Sorensons' intentions, and gives it some weight.

The Court's finding is supported by the fact that Father and Mother declared that Australia, not Minnesota, was their residence on their tax returns, and the fact that the family sold its house in Minnesota along with its two cars and moved most of its personal belongings to Australia.  The Court gives strong weight to these objective indications of the Sorensons' intentions.

The Court does not find the fact that, while in Australia, Father maintained a U.S. drivers license listing his parents' address to weigh heavily in its finding. Australia recognized Father's U.S. drivers license and he renewed the license only three months after leaving the U.S.

8

Nor does the Court find the fact that Father voted by absentee ballot alters its conclusion.  The fact that, while in Australia, Father continued to vote in Minnesota and was listed as "Temporarily Outside of the U.S." on his voting record does weigh towards having an intent to maintain Minnesota as a residence.  However, under the Uniformed and Overseas Citizens Absentee Voting Act,  42 U.S.C. §§ 1973ff to ff-6 and the implementing statutes in Minnesota, a U.S. citizen who has relocated permanently overseas can continue to vote by absentee ballot using his last legal address in the United States.  In this case, Father admitted that he used the family's previous legal address for purposes of absentee voting, although the family had sold the house and no longer resided there.  The Court concludes that Father's continuing to vote absentee ballot, using his former address, is not a strong enough factor to outweigh the other indications that the Sorensons intended to relocate indefinitely to Australia.

The Court's finding is also supported by the fact that the November 7, 2003, offer letter from Secure Computing does not state a termination date for Father's employment in Australia.  The Court awards weight to this fact.

The Court gives little weight to the June 28, 2007, letter from Secure

9

Computing stating that Father's assignment in Australia was from November 24, 2003, until May 15, 2007, because it was created after Father's return to the United States, at Father's request to be used in this international child custody dispute.

The Court gives little weight to the fact that Father maintained a U.S. bank account while in Australia because he also admittedly opened and used an Australian bank account while there.  Additionally, there is incomplete evidence regarding all of Mother's bank accounts and when she maintained them.

In light of the other evidence and having observed Father's testimony, the Court does not find credible Father's testimony that Father and Mother explicitly agreed that they would return to Minnesota after three years.  The Court gives little weight to that testimony.

**The Court finds that, in combination, the foregoing facts establish that the Sorensons intended to abandon Minnesota as their habitual residence and to establish Australia as their new habitual residence.**

B.     **Procedural Background**

1.     **State Court Proceedings**

On May 18, 2007, Father served Mother with a Summons and Petition for dissolution of marriage, venued in Hennepin County District Court, Minnesota.

Father filed the Summons and Petition on May 25, 2007.  In the Petition, Father asked the state court to determine dissolution and child custody issues.

On September 19, 2007, the Hennepin County District Court filed its Order holding that it did not have jurisdiction to address the petition for dissolution because Father was not domiciled in Minnesota for 180 days before filing his Petition.

As to the child custody determination, the state court held that it was without jurisdiction to address that issue because Minnesota was not E.S.S.'s home state.

### 2.    Article 15 Proceedings

On July 16, 2007, Father filed a request for return of E.S.S. under the Convention with the U.S. Department of State.

On October 10, 2007, Rachel Hackwill of the Australian Government Attorney-General's Department, the Australian Central Authority, requested that the U.S. Department of State provide an Article 15 Declaration from a Minnesota court to her.

On November 29, 2007, Father filed a Verified Petition for a Determination Pursuant to Article 15 in this Court.

His claim is brought under the Convention, implemented by the ICARA.

Father requests that this Court issue an order determining

    1.    That the State of Minnesota, United States is the habitual residence of the minor child, E.S.S., within the meaning of Article 4 of the Convention, 19 I.L.M. 1501, *et. seq.*

    2.    That the Defendant has wrongfully retained the minor child, E.S.S., within Australia, within the meaning of Article 3 of the Convention, 19 I.L.M., *et seq.*

(Verified Compl. at 5.)

The United States and Australia are both Contracting States to the Convention.

E.S.S. is below the age of 16.

On January 14, 2008, having had no further contact or submissions from Plaintiff, the Court ordered that Plaintiff file proof of notice of the action to Defendant and then contact the Court to schedule a hearing date in order to expeditiously resolve the Petition.

Mother was personally served in this matter on December 18, 2007.  Father has filed proof of personal service.

After being contacted by Plaintiff, the Court set a bench trial for March 25, 2008.

Mother filed responsive documents and appeared telephonically for the entire bench trial.

### 3. Australian Proceedings

Proceedings in Australian Family Court, in Sydney, are ongoing.

On March 19, 2008, the Australian court issued an order denying Mother's request to enjoin Father from pursuing his Petition in this Court.

The Australian court is awaiting the Article 15 determination from this Court and any subsequent action by the Australian Central Authority before making a custody decision.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction

Article 15 of the Convention provides that the

> judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention.

As explained in the Court's March 19, 2008 Order, this Court does not have subject matter jurisdiction to order return of E.S.S.; however, the Court does have

jurisdiction to make an Article 15 determination for the benefit of the Australian Central Authority.  See, e.g., Morton v. Morton, 982 F. Supp. 675, 688 (D. Neb. 1997) (holding that Utah court had jurisdiction to decide the "wrongfulness" of removal of child the Germany under Hague Convention, although child was located in Germany).

**B.     Notice**

Mother has received proper notice of this action.

Under the ICARA, "[n]otice of an action . . . shall be given in accordance with the applicable law governing notice in interstate child custody proceedings."  42 U.S.C. § 11603(c).

The applicable Minnesota statute provides:

a) Notice required for the exercise of jurisdiction when a person is outside this state may be given in a manner prescribed by the law of this state for service of process or by the law of the state in which the service is made.  Notice must be given in a manner reasonably calculated to give actual notice but may be by publication if other means are not effective.

(b) Proof of service may be made in the manner prescribed by the law of this state or by the law of the state in which the service is made.

Minn. Stat. § 518D.108.

A process server in Australia personally served Mother with the relevant documents.

Personal service was reasonably calculated to give actual notice.

Father's personal service on Mother conforms to Minnesota's notice requirements, and, therefore, with the ICARA's notice requirements.

### C.     Article 15 Determination

#### 1.     Legal Framework

Plaintiff must prove wrongful removal and habitual residence by a preponderance of the evidence.  42 U.S.C. § 11603(e).

Authentication of documents is not required.  42 U.S.C. § 11605.

"[H]abitual residence determinations raise mixed questions of fact and law and therefore should be reviewed de novo."  Silverman v. Silverman, 338 F.3d 886, 896 (8th Cir. 2003) (en banc) (citation omitted).

Article 3 of the Convention provides:

The removal or the retention of a child is to be considered wrongful where – a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal

or retention.

> Generally speaking, 'wrongful removal' refers to the taking of a child from the person who was actually exercising custody of the child.  'Wrongful retention' refers to the act of keeping the child without the consent of the person who was actually exercising custody.  The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period.

Dept. of State, Hague Int'l Child Abduction Convention; Text & Legal Analysis

(Mar. 26, 1986),  51 Fed. Reg. 10494, quoted in Silverman, 338 F.3d at 897.

> A petitioner cannot claim that the removal or retention of a child is 'wrongful' under the Hague Convention unless the child to whom the petition relates is 'habitually resident' in a State signatory to the Convention and has been removed to or retained in *a different State.*  Determination of a child's habitual residence immediately before the alleged wrongful removal or retention is therefore a threshold question in deciding a case under the Hague Convention.

 Karkkainen v. Kovalchuk, 445 F.3d 280, 287 (3d Cir. 2006) (citations omitted).

Therefore,

> wrongful removal or retention claims under Article 3 of the Convention typically raise four questions: (1) When did the removal or retention at issue take place? (2) Immediately prior to the removal or retention, in which state was the child habitually resident? (3) Did the removal or retention breach the rights of custody attributed to the petitioner under the law of the habitual residence? (4) Was the petitioner exercising those rights at the time of the removal or retention?

Id. (citation omitted).

### 2.     When Did the Removal or Retention Take Place?

Until Father's visa expired on June 2, 2007, E.S.S. was located in Australia with the permission of both Father and Mother.  When Father's visa expired, he sought E.S.S.'s return to the United States and, against his wishes, Mother retained E.S.S. in Australia.  Therefore the relevant retention occurred in June 2007.

The Court must next determine in which State E.S.S. was a habitual resident in May 2007.

### 3.     Immediately Prior to the Removal or Retention, in which State Was the Child Habitually Resident?

#### a.     Eighth Circuit Case Law: Silverman

'Habitual residence' is not defined in the language of the Hague Convention or by ICARA.  However, the text of the Convention directs courts to only one point in time in determining habitual residence: the point in time 'immediately before the removal or retention.'  Art. 3.  Additionally, the text of the Convention points to the child's, not the parents', habitual residence. Id.  A person may have only one habitual residence, and it should not be confused with domicile.  [T]he court must focus on the child, not the parents, and examine past experience, not future intentions. Habitual residence may only be altered by a change in geography and passage of time.

> Federal courts are agreed that habitual residence must encompass some form of settled purpose. This settled purpose need not be to stay in a new location forever, but the family must have a sufficient degree of continuity to be properly described as settled. Additionally, the settled purpose must be from the child's perspective, although parental intent is also taken into account.

Silverman v. Silverman, 338 F.3d 886, 897-98 (8th Cir. 2003) (en banc) (citations omitted).

In Silverman, the Eighth Circuit held that the district court erred in determining that children were habitual residents of the United States rather than Israel and stated:

> The court should have determined the degree of settled purpose from the children's perspective, including the family's change in geography along with their personal possessions and pets, the passage of time, the family abandoning its prior residence and selling the house, the application for and securing of benefits only available to Israeli immigrants, the children's enrollment in school, and, to some degree, both parents' intentions at the time of the move to Israel. Fairly assessing these facts, there is only one acceptable legal conclusion regarding the children's habitual residence: they were habitual residents of Israel.

338 at 898-99 (8th Cir. 2003) (footnote omitted). The Eighth Circuit concluded that "one spouse harboring reluctance during a move does not eliminate the settled purpose from the children's perspective." Id. at 899.

In its analysis the Court follows the majority opinion in Silverman. In this

case, there are no issues of domestic violence and the Court is not being called upon to determine whether or not there are affirmative defenses to retention or removal.  If those issues were before the Court, the Court would agree with the dissenting opinion in <u>Silverman</u>.

**b.    Application of <u>Silverman</u> to this Case**

**Applying the <u>Silverman</u> factors to this case, the Court concludes that, E.S.S. was a habitual resident of Australia immediately before the retention.**

One factor mentioned by the <u>Silverman</u> court weighs in favor of the United States being E.S.S.'s habitual residence just prior to the time of retention: there is no evidence that either parent attempted to emigrate to Australia or attempted to obtain any type of benefit only available to Australian immigrants.  However, the Court finds that the other relevant factors all weigh in favor of finding that E.S.S.'s habitual residence was Australia at the time immediately prior to retention.

After examining and weighing all of the relevant facts, the Court concludes that E.S.S.'s habitual residence was Australia at the relevant time.

As the Court has previously found, at the time of the Sorensons' relocation to Australia, they did not have a definite intention to return to the United States,

let alone Minnesota.  Their shared intention was to live in Australia for an

indefinite period of time, lasting at least three years.  This shared intent weighs

towards finding that Australia was E.S.S.'s habitual residence.  <u>See</u> <u>Koch v. Koch</u>,

450 F.3d 703, 718 (7th Cir. 2006) (holding that parents' shared intention to live in

Germany for at least three years supported finding that children's habitual

residence became Germany); <u>Shalit v. Coppe</u>, 182 F.3d 1124, 1128 n.5 (9th Cir.

1999) (noting that "[t]hree years is certainly enough time for [the child] to be

considered 'settled' in Israel, regardless of [the mother's] claimed intention to

have him return permanently to Alaska at some point in the future."), <u>quoted in</u>

<u>Holder v. Holder</u>, 392 F.3d 1009, 1020 (9th Cir. 2004).  <u>Cf.</u> <u>In re Morris</u>, 55 F. Supp.

2d 1156, 1161 (D. Col. 1999) ("Where the duration of a stay in a foreign country is

intended to be indefinite, the habitual residence of a child is usually in that

foreign country.  However, where the stay is intended for a limited, distinct

period of time, ***especially for less than one year***, courts have been reluctant to

find that new habitual residence has been established.") (citations omitted)

(emphasis added).

Father testified that he did not intend the move to Australia to be

"permanent," but a change in habitual residence does not require a "permanent"

move.  As the <u>Silverman</u> court explained, the settled purpose required for a change in habitual residence "need not be to stay in a new location forever, but the family must have a sufficient degree of continuity to be properly described as settled."  <u>Silverman</u>, 338 F.3d at 898 (citation omitted).

Immediately before the retention, E.S.S. was settled in and acclimatized to Australia.

E.S.S. was enrolled in preschool in Australia and had spent the majority of her life in Australia.  She spoke with an Australian accent and all of her friends were in Australia.

Immediately before the retention, the Sorensons had lived in Australia for three years – a significant period of time – and had all remained in Australia despite the breakdown in the family unit and the parents separating to live in separate apartments.

When they moved to Australia, the Sorensons sold their house and cars in Minnesota and transported most of their personal goods to Australia.

By the time that Father's visa expired, he had a definite plan to return to the United States, but, as the Court previously found, this was not Father's set intention at the time the family moved to Australia.

While, at various times, Mother evinced a desire to relocate to the United States, these temporary and unformed plans did not alter E.S.S.'s habitual residence or affect E.S.S.'s daily life.  Additionally, Mother contemplated moving to California, not returning to Minnesota, which further supports the conclusion that Minnesota was not the family's continued habitual residence while the family was in Australia.

Weighing all of these facts, from E.S.S.'s perspective, the Sorensons had a settled purpose to remain in Australia, not the United States.  To E.S.S., Australia was home.  At the time immediately before retention, Australia was E.S.S.'s habitual residence.

### 4.    Conclusion

Because the Court concludes that Australia, not the United States, was E.S.S.'s habitual residence immediately before the retention, the Court does not reach the questions of whether the retention breached Father's custody rights under the law of the habitual residence and of whether Father was exercising those rights at the time of retention.

Accordingly, based upon the files, records, and proceedings herein,  **IT IS HEREBY ORDERED**:

1.   The minor child, E.S.S. was a habitual resident of Australia at the time immediately prior to her retention in Australia.

2.   Plaintiff's Verified Petition for a Determination Pursuant to Article 15 [Docket No. 1] is **DISMISSED**.

3.   A copy of this decision is to be furnished to the United States Central Authority and it may be used in Australia under Article 15 of the Hague Convention.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:   April 9, 2008                                 s / Michael J. Davis
                                                      Judge Michael J. Davis
                                                      United States District Court